## HINSON SNIPES, LLP

Princeton Forrestal Village
116 Village Boulevard, Suite 307
Princeton, New Jersey 08540
P: (609) 452-7333 & F: (609) 452-7332

**Tracey C. Hinson, Esq.**     **Attorney ID# 034542002**
**Eric D. Dakhari, Esq.**      **Attorney ID# 034762008**
Attorneys for Plaintiff

---

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **QUASEAN GOLDSTEIN** and **JACQUELINE DUETTE**<br><br>Plaintiffs<br><br>v.<br><br>**CITY OF TRENTON; UNITED STATES OF AMERICA, U.S. MARSHALS SERVICE; NEW JERSEY STATE POLICE;**<br><br>**FORMER TRENTON POLICE DEPARTMENT DIRECTOR SHEILAH COLEY**, in individual capacity; **TRENTON POLICE DEPARTMENT POLICE OFFICER RICHARD AGABITI**, in individual capacity; **TRENTON POLICE DEPARTMENT POLICE OFFICER MIGUEL ACOSTA,** in individual capacity**,**<br><br>**TRENTON POLICE DEPARTMENT POLICE OFFICER JOHN DOE (1-10),** in individual capacity; **DEPUTY U.S. MARSHAL JOHN DOE (1-10),** in individual capacity; and **NEW JERSEY STATE TROOPER JOHN DOE (1-10),** in individual capacity,<br><br>Defendants | Civil Action No. 3:23-cv-00302<br><br><br><br><br><br><br><br>COMPLAINT<br>&<br>JURY TRIAL DEMAND |

---

# CIVIL COMPLAINT

## PRELIMINARY STATEMENT

1.      This is civil-rights case involves the unlawful actions and inactions of law-enforcement officers operating on a **Joint Task Force**, under the color of law, for the Trenton Police Department, U.S. Marshals Service, and New Jersey State Police.

2.      Led by Trenton Police Department, Police Officer **Richard Agabiti**, the law-enforcement officers, without probable cause, (1) executed an unlawful, warrantless search of a home owned and occupied by **Mr. Quasean Goldstein** and his mother, **Ms. Jacqueline Duette**—at or about 4 o'clock in morning; (2) effected the false arrest of **Goldstein**, and (3) used unlawful force by applying handcuffs to **Goldstein** in an excessively tight manner, ignoring—for hours— his multiple complaints that the handcuffs were causing significant pain.

3.      A medical doctor confirmed plaintiff's complaint about the excessively tight handcuffs using radiographic imaging, which revealed a painful, displaced, left distal-radius fracture,[1] which has resulted in nerve damage, continued pain, and permanent injury.

---

[1]     The radius is one of two forearm bones and is located on the thumb side. The part of the radius connected to the wrist joint is called the distal radius. When the radius breaks near the wrist, it is called a distal radius fracture.

4.     The Trenton Police Department police officers' actions and inactions were tacitly approved and thus, sanctioned through the City of Trenton's police policy, practice, custom, and deliberate indifference.

5.     Accordingly, through this Complaint, **Goldstein** seeks damages for pain and suffering, loss of enjoyment of life, loss of earnings, realized and future medical expenses, and violations of federal and state constitutional rights.

6.     Also, through this Complaint, **Duette** seeks damages for violations of federal and state constitutional rights.

## JURISDICTION & VENUE

7.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1346; 42 U.S.C. §§ 1983, 1985 and 1988; and the Fourth and Fourteenth to the United States Constitution; as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), under the New Jersey State Constitution and New Jersey common law.

8.     Pursuant to 28 U.S.C. § 1391(e), this District Court serves a proper venue for claims against federal employees.

## PARTIES

9.     Plaintiff, **Quasean Goldstein** and **Jacqueline Duette** are residents of New Jersey.

10.    Defendant, **City of Trenton**   is a municipal corporation lawfully authorized to maintain the law-enforcement agency known as the Trenton Police Department (the "Department" or "TPD"), which acts as its law-enforcement arm and is, thus, responsible for creating, maintaining, and enforcing TPD rules, policies, and procedures; as well as overseeing and controlling police hiring, retention, training, supervising, and operations for the individually named (including fictitiously named) **Trenton Police Department, Police Officers** who violated plaintiff's constitutional rights; for which, it assumes all risks and responsibly incidental to their conduct and the TPD's day-to-day operation.

11.    Defendant, **United States of America**, is a sovereign and body politic lawfully authorized to maintain the federal law-enforcement agency known as the **U.S. Marshals Service**.

12.    Defendant, **U.S. Marshals Service (USMS),** is a federal law-enforcement bureau operating within the U.S. Department of Justice under the U.S. Attorney General's direction and serves as the primary federal agency responsible for fugitive investigations.

4

13.    Defendant, **New Jersey State Police (NJSP),** is law-enforcement agency operating within the New Jersey Department of Law & Public Safety under the New Jersey Attorney General's direction and responsible for enforcing the laws of the State of New Jersey.

14.    Defendant, **Sheilah Coley**, former Trenton Police Department, Director, sued in individual capacity, was a supervising officer, employee, or agent of the TPD police department.

15.    Defendant, **Richard Agabiti**, Trenton Police Department, Police Officer (**P.O. Agabiti**), sued in individual capacity, was acting within the scope of employment, under color of law, as a law-enforcement officer assigned to the Street Crimes Unit (SCU) in the TPD as the City's agent, servant, or employee operating in concert with or within the *January 19, 2021 Task Force operations described in this Complaint*, and thus, was responsible for the unconstitutional police practices, actions, and inactions that violated plaintiff's constitutional rights.

16.    Defendant, **Miguel Acosta**, Trenton Police Department, Police Officer (**P.O. Acosta**), sued in individual capacity, was acting within the scope of employment, under color of law, as a law-enforcement officer assigned to the OPRA Request Department for the TPD as the City's agent, servant, or employee conspiring with **P.O. Agabiti**, **P.O. John Doe (1-10), and Deputy**

**Marshal John Doe (1-10)** to cover-up the unconstitutional police practices, actions, and inactions that violated plaintiff's constitutional rights, and thus violated plaintiff's

17.    Defendant, **Trenton Police Department Police Officer John Doe (1-10)** (fictitiously  named), the identity and number of individuals is presently unknown to plaintiff, sued in individual capacity, was acting within the scope of employment, under color of law, as a law-enforcement officer (in the role of supervisor, trainer, officer, or other TPD representative capacity) in the TPD as the City's agent, servant, of employee operating in concert with or within the *January 19, 2021 Task Force operations described in this Complaint*, and thus, was responsible for the unconstitutional police practices, actions, and inactions that violated plaintiff's constitutional rights.

18.    Defendant, **Deputy U.S. Marshal John Doe (1-10) (DM)** (fictitiously named), the identity and number of individuals is presently unknown to plaintiff, sued in individual capacity, was acting within the scope of employment, under color of law, as a law-enforcement officer (in the role of *supervisory* deputy marshal, *special* deputy marshal, *deputy* marshal, *clerk*, or other USMS representative capacity) as a USMS's agent, servant, or employee operating in concert with or within the *January 19, 2021 Task Force operations described in this Complaint*, and thus, was responsible for the

unconstitutional police practices, actions, and inactions that violated plaintiff's constitutional rights.

19.    Defendant, **New Jersey State Trooper John Doe (1-10)** (fictitiously named), the identity and number of individuals is presently unknown to plaintiff, sued in individual capacity, was acting within the scope of employment, under color of law, as a law-enforcement officer (in the role of supervisor, trainer, trooper, or other NJSP representative capacity) as the NJSP's agent, servant, or employee operating in concert with or within the *January 19, 2021 Task Force operations described in this Complaint*, and thus, was responsible for the unconstitutional police practices, actions, and inactions that violated plaintiff's constitutional rights.

## FACTUAL ALLEGATIONS

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

### A 4:00 A.M. Morning Intrusion

20.    On or about January 19, 2021, about and around 4 o'clock in the morning, **P.O. Agabiti**, along with **P.O. John Doe (1-10), Deputy Marshal John Doe (1-10),** and **State Trooper John Doe (1-10) (the "Task Force").** arrived at a home owned by **Goldstein** and **Ms. Jacqueline Duette**, his mother.

21.    At that time, **Goldstein** and **Duette** were sound asleep in there home.

22.    But within that early 4 o'clock A.M. hour—led by the arresting officer, **P.O. Agabiti**—the **Task Force** loudly banged on the door of the home and yelled orders for the occupants to open the door.

23.    Because of the banging and yelling, **Goldstein** and **Duette** were shaken from their sleep.

24.    Alarmed, frightened, and confused, **Goldstein** and **Duette** worried for their safety.

25.    Alarmed, frightened, and confused, **Goldstein** and **Duette** agreed that **Goldstein** would answer the door.

26.    In only his underwear, and without shoes, **Goldstein** complied with the **Task Force** commands and opened the door.

27.    After **Goldstein** opened the door, **Task Force** members grabbed him from the entrance threshold, forced him outside the home, without shoes and in his underwear only; face-down on the ground, approximately 20 feet in front of his home.

28.    **Goldstein** and **Duette** were shocked and frightened by the aggressive tactics used by the **Task Force**.

29.    While **Goldstein** was outside, **Duette** worried for son's safety.

## An Arrest Without Probable Cause

30.    Although **Goldstein** attempted to explain that he had never committed a crime and never had been arrested, **P.O. Agabiti** arrested **Goldstein**, while **Goldstein** was outside his home without shoes and in his underwear only, face-down on the ground, approximately 20 feet in front of his home.

31.    **P.O. Agabiti** arrested **Goldstein** despite not having probable cause to do so.

32.    Notably, upon information and belief, on January 19, 2021, while **Goldstein** was without shoes, in only his underwear, and face-down outside on the ground, the outdoor temperature was approximately 32 degrees

Fahrenheit with a wind speed of approximately 6.5 to 7.5 mph, resulting in an outdoor temperature feeling like approximately 25 to 27 degrees Fahrenheit.

### Excessive Force: Excessively Tightened Handcuffs and Severe Pain

33.    After **P.O. Agabiti** arrested **Goldstein**, **P.O. Agabiti** or a member of the **Task Force** placed **Goldstein** in handcuffs while he was without shoes, in only his underwear, and face-down outside on the ground, approximately 20 feet in front of his home.

34.    Immediately after **P.O. Agabiti** or a member of the Task Force tightened the handcuffs, **Goldstein** immediately complained to **P.O. Agabiti** and other **Task Force** members that the handcuffs were  excessively tightened and causing severe pain.

35.    At that time, **Goldstein** also complained to other **Task Force** members that the handcuffs were excessively tightened and causing severe pain.

36.    Despite **Goldstein's** immediate and multiple complaints that the handcuffs were causing severe pain, **P.O. Agabiti** and the **Task Force** members, removed **Goldstein** from the ground and ordered him back into his home.

37.    Again, hearing **Goldstein** complain to the **Task Force** members about the severe pain from the excessively tightened handcuffs, Duette was fearful and worried about her son's health and safety.

### A Warrantless Home Search
### Conducted without Justification or Consent

38.    While some **Task Force** members manhandled Goldstein in freezing weather outside of his home, other **Task Force** members illegally entered Goldstein's home without Goldstein's or Duette's consent.

39.    After reentering the home, with **Goldstein's** handcuffs excessively tightened, **P.O. Agabiti** and the **Task Force** members ordered Goldstein to sit down.

40.    Goldstein complied with the order to sit, **P.O. Agabiti** and the **Task Force** members conducted an extensive search throughout the entirety of Goldstein's home without Goldstein's or Duette's consent.

41.    **P.O. Agabiti's** and the **Task Force's** search of the entirety of the home spanned, at least, 30 to 45 minutes.

42.    **P.O. Agabiti** and the **Task Force** did not search **Goldstein's** home incident to the arrest, because **P.O. Agabiti** arrested him approximately 20 feet outside the home.

43.    **P.O. Agabiti** and the **Task Force** did not search the home based on reasonable articulable suspicion that the home harbored a person who posed a danger to the Task Force.

44.    **P.O. Agabiti** and the **Task Force** did not perceive any exigent circumstances justifying their search of the home.

45.    During **Task Force's** search of the entirety of the home, Goldstein continued to complain to **P.O. Agabiti** and the Task Force members that the handcuffs were excessively tightened and causing severe pain.

46.    But instead of addressing the apparent medical need to inspect and refix the handcuffs so that their application would not cause severe pain, the Task Force merely provided **Goldstein** with garments to cover his body and slippers to cover his feet.

### Goldstein Remains in Excessively Tightened Handcuffs for Hours Despite His Innocence

47.    Upon arrival at the Trenton Police Department Headquarters, **P.O. Agabiti** placed **Goldstein** into a holding cell while the handcuffs were excessively tight and causing severe pain.

48.    While inside of the holding cell, Goldstein complained to **P.O. Agabiti** and other law enforcement officers that the handcuffs were excessively tight and causing severe pain.

49.    **Goldstein** also complaint to other TPD police officers that the handcuffs were too tight and causing severe pain.

50.    Eventually, a police supervisor arrived to verify the identity of the arrested individual.

51.    The police supervisor immediately indicated to **P.O. Agabiti** that **Goldstein** was innocent.

52.    But despite the police supervisor's acknowledgment that **Goldstein** was innocent of any crimes, **P.O. Agabiti** did not relieve **Goldstein** from the excessively tight handcuffs and severe pain.

53.    After the police supervisor indicated **Goldstein's** innocence, **P.O. Agabiti and P.O. John Doe (1-10)** placed **Goldstein** back into the holding cell without removing or loosening the handcuffs.

54.    Eventually, **P.O. Agabiti** removed **Goldstein** from the holding cell in preparation to transport **Goldstein** back to his home.

55.    But during that preparation and during the TPD's transport of **Goldstein** back to his home the handcuffs remained excessively tight, and the pain remained severe.

56.    **P.O. Agabiti** removed the handcuffs—after hours of application—only after **Goldstein** was placed back inside his home.

57.    At that point, **P.O. Agabiti** tried to explain that the arrest was the result of a mistake.

58.    **P.O. Agabiti** and **P.O. John Doe (1-10)** also attempted to obtain information from **Goldstein** about other crimes, but **Goldstein** was clueless and continued to explain that he has a clean record and had never been arrested.

59.    In response, **P.O. Agabiti** and **P.O. John Doe (1-10)** asked for **Goldstein's** phone and placed his contact information in the phone.

60.    **Goldstein** eventually sought medical care and treatment for injuries sustained from the excessively tight handcuffs.

61.    According to **Goldstein's** medical records, he has suffered nerve damage resulting in a permanent injury.

## COUNT I
### MUNICIPAL LIABILITY (42 U.S.C § 1983)

as to CITY OF TRENTON

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

62.    **City of Trenton** police officers have a long and documented history of aggressive police practices, including unnecessary deployment of use of force, false arrests, falsifying official police reports, cover-ups, racial profiling, and

sham internal-affairs investigations, all of which demonstrate a systemic absence of adequate training, supervision, credible internal-affairs investigation, and discipline.

63.    Despite the facts and circumstances surrounding the false arrest and excessive use of force as to plaintiff, the **City of Trenton** has failed to effectively investigate the investigating and arresting police officers' actions, which permitted the led to the false arrest and use of excessive force or impose any discipline on the police officers and supervisors involved.

64.    **City of Trenton** and TPD, through its internal affairs department and its police officers, have engaged in past practices and policy of sanctioning deliberate indifference to complaints of violations of constitutional rights by citizens such as plaintiff, against Trenton police officers

65.    In that regard, **City of Trenton** and TPD's scandal plagued internal-affairs department is a sham, and, as such, creates an environment wherein police officers believe they can act unlawfully without any repercussions or discipline, which is directly linked to the violation plaintiff constitutional rights.

66.    The actions of **P.O. Agabiti, P.O. Acosta, and P.O. John Doe (1-10)** as alleged herein were done pursuant to one or more interrelated de facto **City of Trenton** and TPD policies, practices, or customs.

67.     At all times material to this complaint **City of Trenton** and TPD had interrelated de facto policies, practices, and customs, which were the moving forces behind the violation of **Plaintiffs'** constitutional rights, which included, *inter alia*:

68.     the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel, and otherwise control police officers who commit acts of excessive force, including unjustified shootings,

     A.     the police code of silence,

     B.     the encouragement of excessive and unreasonable force,

     C.     the failure to properly investigate shootings of civilians, particularly young Black men, by Trenton police officers,

     D.     the failure to properly discipline, monitor, counsel and otherwise control Trenton police officers who engage in unjustified uses of force,

     E.     the failure to properly train and supervise Trenton police officers regarding deploying use of force tactics in effectuating arrests,

     F.     the failure to properly train and supervise Trenton police officers regarding the proper application of handcuffs,

G.      the failure to properly train and supervise Trenton police officers regarding appropriate monitoring of and responses to unnecessary harm caused an application of handcuffs, and

H.      the failure to properly train and supervise Trenton police officers regarding the inappropriate application of police actions based on racial profiling.

69.    The policy, practice, and custom of a police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, including the unjustified use of force, despite their obligation under police regulations to do so, and also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, in cases where they and their fellow officers have used excessive force or engaged in unjustified shootings of civilians.

70.    The de facto policies, practices, and customs of failing to hire, train, supervise, monitor, discipline, transfer, counsel, and control police misconduct and the code of silence are interrelated and exacerbate the effects of each other, to institutionalize police lying and immunize police officers from discipline.

71.    The policies, practices, or customs of failing to hire, supervise, train, discipline, monitor, transfer, counsel, or control police misconduct and the police code of silence, separately and together, proximately caused injury to **Plaintiffs** because **P.O. Agabiti, P.O. Acosta,** and **P.O. John Doe (1-10)** had substantial reason to believe that the **City of Trenton** and TPD would not reveal their misconduct through internal-affairs investigations and would not reported by fellow officers or their supervisors, and that they were immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

72.    But for the belief that they would be protected, both by the **City of Trenton**, TPD, and fellow officers from serious consequences, **P.O. Agabiti, P.O. Acosta,** and **P.O. John Doe (1-10)** would not have engaged in the unreasonable and unconstitutional conduct that resulted in harm caused to plaintiff, as described in this complaint.

73.    Additionally, that the unconstitutional actions of the TPD defendants were part of a widespread municipal policy, practice, and custom is further established by the involvement in, and ratification of, these acts by **City of Trenton** supervisors and policy makers, as well as by a wide range of other police officials, including the TPD's Internal Affairs, as well as  Detective and the Public Affairs departments.

74.    That involvement and ratification is further demonstrated by the public statements of these policy making officials, and the TPD's failure to properly investigate the unconstitutional conduct of the TPD defendants, or to discipline them for their unconstitutional conduct.

75.    Likewise, prior to and after the TPD's negligent police response, intervention, arrest, and internal affairs investigations, permitting the violation of **Plaintiffs'** constitutional rights, **City of Trenton** knew or should have known about the pervasive and systemic pattern  or custom and practice of police policy violations, related to effecting arrests, use of force, handcuffing, rendering medical assistance, and internal affairs investigation, as there were numerous incidents, complaints, and lawsuits alleging various breaches of police policy and procedure related those subjects brought by citizens against TPD police officers.

76.    For example

A.    Between 2012 and 2016, Trenton police officers used force 204 times.

B.    Between 2012 and 2016, TPD averaged 5.6 use of force incidents per police officer.

C.    Between 2012 and 2016, 72 of 204 police officer used force at a rate higher than the department average.

D.    Between 2012 and 2016, based on population, a black person in Trenton was 42% more likely to have force used on them than a white person.

E.    Between 2012 and 2016, based on arrests, a black person in Trenton was 42% more likely to have force used on them than a white person.

F.    On April 9, 2017, a Trenton man involved in a routine traffic stop fled in his vehicle and then on foot and was pursued by Trenton police officers. The man was eventually surrounded by Trenton police officers and complied when he was ordered to put his hands in the air. While the man was complying with further police commands, P.O. Anthony Villanueva approached the man and punched him in the face and P.O. Drew Inman tackled the man to the ground. Inman and Villanueva then punched the man numerous times, while he cried out in pain, and told officers, "stop hitting me in my face," and "you've got my hands." The two police officers were charged with civil rights violation and obstruction of justice charges.

G.    On Nov. 28, 2017, P.O. Anthony Villanueva, who had been assigned to work in the holding cell area of Trenton Police

Headquarters, sprayed Oleoresin Capsicum (commonly referred to a "pepper spray") on a prisoner who was confined in a holding cell. Villanueva later completed an incident report that contained numerous false statements designed to conceal his unlawful conduct and improper treatment of the prisoner.

H.    On August 11, 2019, City of Trenton P.O. Cerick Avalos, **P.O. Richard Agabiti**, P.O. Brier Doggett, and P.O. Nathan Bolognini arrested Clarence Boone arrested and maliciously prosecuted Clarence Boone on three drug-related counts. But Mercer County prosecutors dismissed the case when a witness stepped forward with information backing Boone's claims that police officers intentionally left out information from reports to frame him for the drugs.

77.    As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation; and **Goldstein** and **Duette** suffered violations of constitutional rights.

## COUNT II
### EXCESSIVE FORCE (42 U.S.C. § 1983 & N.J.S.A. § 10:6-2)

as to POLICE OFFICER, RICHARD AGABITI; POLICE OFFICER, JOHN DOE (1-10); DEPUTY MARSHAL, JOHN DOE (1-10); and STATE TROOPER, JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

78. **P.O. Agabiti, P.O. John Doe (1-10), Deputy Marshall John Doe (1-10); and State Trooper John Doe (1-10) (collectively "Arresting Defendants")**, used unreasonable force by applying handcuffs to **Goldstein** in an excessively tight manner causing severe pain.

79. Despite **Goldstein's** multiple complaints to **Arresting Defendants** that the handcuffs were excessively tight and causing severe pain, **Arresting Defendants** refused to examine the application of the handcuffs and provide Goldstein with appropriate relief.

80. **Arresting Defendants** deliberately subjected **Goldstein** to excessively tight handcuffs and severe pain over the course of several hours.

81. As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation, and violations of constitutional rights.

## COUNT III
### WARRANTLESS SEARCH AND FALSE ARREST (42 U.S.C. § 1983)

as to POLICE OFFICER, RICHARD AGABITI; POLICE OFFICER, JOHN DOE (1-10); DEPUTY MARSHAL, JOHN DOE (1-10); and STATE TROOPER, JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

82.    On January 19, 2021, without search and arrest warrants and without probable cause,  **P.O. Agabiti, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10), (collectively "Arresting Defendants")**, Arresting Defendants unconstitutionally search **Plaintiffs'** home and arrested **Goldstein**.

83.    A, purported, full and complete TPD Arrest Report was created and drafted by **P.O. Agabiti**.

84.    In that Arrest Report, **P.O. Agabiti** lists himself as the "Arresting Officer."

85.    Furthermore, **P.O. Agabiti** states that members of the USMS Regional Task Form arrested plaintiff.

86.    On July 7, 2022, by way of email, **P.O Acosta** indicated that the USMS and NJSP were operating as part of a "joint taskforce."

87.    As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and

permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation; and **Goldstein** and **Duette** suffered  violations of constitutional rights.

## COUNT IV
### CONSPIRACY (42 U.S.C. § 1983)

as to DIRECTOR SHIELA COLEY, POLICE OFFICER RICHARD AGABITI; POLICE OFFICER MIGUEL ACOSTA, POLICE OFFICER JOHN DOE (1-10), DEPUTY MARSHAL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

### CONSPIRACY TO CONDUCT AN UNLAWFUL SEARCH AND ARREST

88.　Under color of law, **P.O. Agabiti, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10) (collectively "Task Force Conspirators")** acted in concert and agreed to (1) conduct an unlawful warrantless search of the home owned and occupied by Goldstein and his mother, Duette, (2) arrest Goldstein without probable cause, and (3) subject him to hours of severe pain caused by excessively tightened handcuffs.

89.　In furtherance of their conspiratorial objectives, **Task Force Conspirators** committed the following overt actions and inactions:

A.    ignored, disregarded, or recklessly overlooked readily accessible and accurate information which indicated the plaintiffs home did not harbor an individual who had committed or was about to commit a crime,

B.    ignored law-enforcement rules, policies, and procedures by deliberately entering plaintiffs' home and conducting an unlawful search,

C.    ignored law-enforcement rules, policies, and procedures; as well as readily accessible and accurate information which indicated that no probable cause existed to support an arrest of Goldstein

D.    ignored law-enforcement rules, policies, and procedures and deliberately or recklessly applied handcuffs in an excessively tight manner causing severe pain, and

E.    ignored law-enforcement rules, policies, and procedures and deliberately or recklessly refused to respond to Goldstein's multiple complaints that the handcuffs were excessively tight and causing severe pain.

90.    The actions and inactions committed by **Task Force Conspirators** deprived Goldstein of equal protection under the law and the right to be free from unlawful search and seizures.

## CONSPIRACY TO COVER-UP UNLAWFUL SEARCH AND ARREST

91.    Under color of law, **Director Coley**, **P.O. Agabiti, P.O. Acosta, and P.O. John Doe (1-10) (collectively "TPD Conspirators")** acted in concert and agreed to cover-up the unlawful actions and inactions of **P.O. Agabiti and P.O. John Doe (1-10)**, by truncating, falsifying, and withholding official police records, reports, and materials related to the January 19, 2021, incident involving plaintiffs.

92.    In that regard, on or about January 22, 2022, a lawful Open Public Records Act (OPRA) request (Reference # OPR-2022-00894) was submitted seeking to obtain copies of the following materials:

A.    all *use-of-force reports* for the January 19, 2021, incident involving **Goldstein**,

B.    copies of all *CAD reports* relating to the January 19, 2021, incident,

C.    the *names, badge numbers*, and car numbers for all officers who responded to the **Goldstein** incident on January 19, 2021,

D.    copies of all documents *pertaining to arrest, warrants, court appearances*, or any other documents provided to **Goldstein**,

E.    copies of all *911 calls and call logs*, including the name and telephone numbers of the callers who called to report the arrest of **Goldstein**,

F.    copies of *audio and video recordings from the body cameras* worn by all Trenton Police Department police officers responding to the January 19th, 2021, incident, from the start of the officers' shift to the end of their shift,

G.    copies of all *dashcam, body cam videos, and all audio and video recordings from inside the vehicles* of all officers who responded to 26 Spring St, Trenton NJ, on January 19, 2021,

H.    copies of *all videos obtained from the holding cell* where **Goldstein** was detained on January 19, 2021,

I.    as to each Trenton Police Department police officer present at any time during the January 19, 2021, incident involving **Goldstein**, provide the individuals *name, title, position, salary, payroll record for 2020-21, date of hire, and length of service*, and

J.    A copy of *all lawsuits served on the city of Trenton against Trenton Police Department police officers* filed between January 2015 to date.

93.    On July 7, 2022, in response to those *ten* requests, and in furtherance of their conspiratorial objectives, **TPD Conspirators** committed the following overt actions and inactions:

A.    With **Director Coley's** explicit and tacit approval, **P.O. Agabiti** willfully created an incomplete and misleading Arrest Report that lacked any meaning investigative and arrest particulars,

B.    With **Director Coley's** explicit and tacit approval**, P.O. Agabiti** and **P.O. John Doe (1-10),** refused to create an Investigative Report containing the facts and circumstances leading up to, during, and after the January 19, 2021, incident; or they refused to make it available to in response to the June 22, 2022, OPRA request,

C.    With **Director Coley's** explicit and tacit approval, **P.O. Agabiti** and **P.O. John Doe (1-10)**, refused to create a Use-of-Force Report containing the facts and circumstances surrounding the use of force leading up to, during, and after the January 19, 2021, incident; or they refused to make it available to in response to the June 22, 2022, OPRA request,

D.    With **Director Coley's** explicit and tacit approval, **P.O. Agabiti** and **P.O. John Doe (1-10)**, refused to create other mandated TPD forms and reports regarding the facts and circumstances

surrounding the arrest and use of force leading up to, during, and after the January 19, 2021, incident; or they refused to supply the forms and reports in response to the June 22, 2022, OPRA request,

E.    Despite the existence of documents and materials responsive to the June 22, 2022, OPRA request, within the TPD's custody and control, **P.O. Acosta**, in concert with **P.O. Agabiti** and **P.O**. **John Doe (1-10)**, supplied only (1) a document titled "Trenton Police and Fire Event Report" (presumably the CAD report) and (2) a document titled "Arrest Report," and no other documents and materials to in response to the June 22, 2022, OPRA request,

F.    Despite the existence of documents and materials responsive to the June 22, 2022, OPRA request, within the TPD's custody and control, **P.O. Acosta**, in concert with **P.O. Agabiti** and **P.O**. **John Doe (1-10)**, sent a July 7, 2022, email addressing the OPRA requests, stating: "Unable to locate any body cam footage. Waiting on any audio from 011 and radio. Anything further you will have to reach out to the U.S. Marshals and state police. It was a joint task force."

G.    Despite the existence of documents and materials responsive to the June 22, 2022, OPRA request, within the TPD's custody and

control, **P.O. Acosta**, in concert with **P.O. Agabiti** and **P.O**. **John Doe (1-10)**, refused to provide those documents and materials.

94.    As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Golstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation; and **Goldstein** and **Duette** suffered violations of constitutional rights.

## COUNT V
### FAILURE TO TRAIN & DISCIPLINE (42 U.S.C. § 1983)

as to DIRECTOR SHEILAH COLEY, POLICE OFFICER RICHARD AGABITI, POLICE OFFICER JOHN DOE (1-10), DEPUTY U.S. MARSHALL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

95.    Under color of law, **Director Coley, P.O. Agabiti, P.O Acosta, Deputy U.S. Marshal John Doe (1-10), and State Trooper John Doe (1-10) (collectively "Supervisor and Trainer Defendants"),** were supervisors and trainers responsible for training and disciplining law-enforcement officers, including, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10)**, in

executing search warrants, effecting arrest, using force, and safeguarding citizen constitutional rights.

96.    Upon hiring **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10)**, and their subsequent assignment to law-enforcement duties, respectively, **Supervisor and Trainer Defendants** knew or should have known that the law-enforcement officers' tasks and responsibilities required close and frequent involvement with citizens in the African American and minority communities.

97.    **Supervisor and Trainer Defendants** knew or should have known that close, and frequent involvement with citizens in the African American and minority communities, included conducting criminal investigations to identify suspects, executing search warrants in private homes, and effecting arrests by using force.

98.    In that regard, the **Supervisor and Trainer Defendants** knew or should have known that failing to train and discipline, law-enforcement officers, including, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10)**, in conducting criminal investigations to identifying suspects, executing search warrants in private homes, and effecting arrests by using force, could lead to

unlawful and unconstitutional law-enforcement actions and inactions, as well as serious physical injuries.

99.    The failure to train and supervise, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10),** by **Supervisor and Trainer Defendants**, was the moving force behind the unlawful and warrantless home search at 4 o'clock in the morning, false arrest, excessive use of force, and violation of plaintiff's constitutional rights.

100.   As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation; **Goldstein** and **Duette** and violations of constitutional rights.

## COUNT VI
### SUPERVISOR LIABILITY (42 U.S.C § 1983)

as to DIRECTOR SHEILAH COLEY, POLICE OFFICER RICHARD AGABITI, POLICE OFFICER JOHN DOE (1-10), DEPUTY U.S. MARSHALL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

101. Leading up to and during the unlawful and warrantless home search at 4 o'clock in the morning, false arrest, use of excessive force, and release of plaintiff, **Director Coley, P.O. Agabiti, P.O Acosta, Deputy U.S. Marshal John Doe (1-10), and State Trooper John Doe (1-10) (collectively "Supervisor Defendants")** were individuals responsible for supervising law-enforcement officers, including, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10)**.

102. Leading up to and during the unlawful and warrantless home search at 4 o'clock in the morning, false arrest, use of excessive force, and release of plaintiff, **Supervisor Defendants** were individuals who had actual knowledge of, participated in, or were present during the unlawful actions and inactions by, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10)**, that violated **Plaintiffs'** constitutional rights.

103.   **Supervisor Defendants** owed a duty of care to **Plaintiffs** to ensure that, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1–10), Deputy Marshal John Doe (1–10), and State Trooper John Doe (1–10)**, were adequately trained, supervised, and disciplined on law-enforcement rules, policy, and procedure in conducting criminal investigations to identify suspects, executing search warrants in private homes, and effecting arrests by using force in a constitutional manner.

104.   Accordingly, **Supervisor Defendants** were required to create, approve, and implement training, supervisory, and disciplinary rules, policy, and procedure for law-enforcement officers including, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1–10), Deputy Marshal John Doe (1–10), and State Trooper John Doe (1–10).**

105.   In that regard, as to **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1–10), Deputy Marshal John Doe (1–10), and State Trooper John Doe (1–10), Supervisor Defendants** failed, respectively, to:

A.    adequately evaluate  training, experience, and fitness for law-enforcement duties,

B.    ensure provision of adequate training on rules, policing standards, and policy and procedure,

C.    monitor and evaluate implementation of rules, policing standards, and policy and procedure,

D.    correct and ensure adequate discipline for violations of rules, policing standards, and policy and procedure.

106.  Furthermore, **Supervisor Defendants** did not permit, support, or enforce full and adequate internal affairs investigations into the law-enforcement actions and inactions conducted in African American and other minority communities.

107.  For example, **Supervisor Defendants** did not permit, support, or enforce a full and adequate internal affairs investigation to evaluate the law-enforcement actions and inactions conducted by, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10),** that resulted in an unlawful and warrantless home search at 4 o'clock in the morning, false arrest, excessive use of force, and violation of **Plaintiffs'** constitutional rights.

108.  Had **Supervisor Defendants** adequately trained, monitored, and disciplined the law-enforcement actions and inactions in conducting criminal investigations to identify suspects, executing search warrants in private homes, and effecting arrests by using force by law-enforcement officers, including, respectively, **P.O. Agabiti, P.O. Acosta, P.O. John Doe (1-10),**

35

**Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10), Plaintiffs'** would not have suffered civil rights violations.

109.   As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation; and **Goldstein and Duette** suffered  violations of constitutional rights.

## COUNT VII
### RACIAL DISCRIMINATION (42 U.S.C. § 1983)

as to POLICE OFFICER RICHARD AGABITI, POLICE OFFICER MIGUEL ACOSTA, POLICE OFFICER JOHN DOE (1-10), DEPUTY U.S. MARSHAL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

110.   Under color of law, **P.O. Agabiti, P.O. John Doe (1-10), Deputy Marshal John Doe (1-10), and State Trooper John Doe (1-10) (collectively "Arresting Defendants")** , violated 42 U.S.C. § 1983, the Fourteenth Amendment of the United States Constitution, and the New Jersey Constitution by depriving plaintiff of his constitutional rights because of race, with animus.

111.   Because of his African American identity, **Arresting Defendants**, under color of law, racially profiled, targeted, and falsely arrested plaintiff.

112.   **Arresting Defendants** displayed a clear racial bias by treating plaintiff differently than other similarly situated non-minority individuals—based on nothing more than their false, stereotypical, and racist assumption that an African American male was involved in and had knowledge of a crime—which is evident in their unlawful warrantless home search at 4:00 o'clock in the morning, use of excessive force in applying handcuffs, and false arrest without probable cause.

113.   The unlawful warrantless home search at 4:00 o'clock in the morning, use of excessive force in applying handcuffs, and false arrest without probable cause were the result of an out-of-control law-enforcement task force to arrest plaintiff simply because of his race.

114.   Based on **plaintiffs'** race, **Defendant Arresting Officers** knowingly undertook unlawful and unconstitutional actions and inactions with the intent to deny plaintiff's right to full and equal protection of the law.

115.   As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical

treatment and rehabilitation; and **Goldstein** and **Duette** suffered violations of constitutional rights.

## COUNT VIII
### NEGLIGENCE

as to POLICE OFFICER RICHARD AGABITI, POLICE OFFICER JOHN DOE (1-10), DEPUTY MARSHAL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

116. **P.O. Agabiti**, **P.O. John Doe (1-10)**, **Deputy Marshal John Doe (1-10)**, and **State Trooper John Doe (1-10)** negligently applied and failed to examine and correct the application of excessively tightened handcuffs.

117. As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, **Goldstein** suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation, and violations of constitutional rights.

## COUNT IX
### NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

as to as to FORMER POLICE DIRECTOR SHEILAH COLEY, POLICE OFFICER RICHARD AGABITI, POLICE OFFICER MIGUEL ACOSTA, POLICE OFFICER JOHN DOE (1-10), DEPUTY U.S. MARSHAL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

118.    Defendants, under color of law, acted intentionally, recklessly, and with deliberate disregard of a high degree of probability that emotional distress would follow the harm created in false arresting and using excessive force against plaintiff.

119.    The acts and omissions defendants committed were extreme and so outrageous in character and degree as to go beyond all possible bounds of decency, and their conduct was so atrocious, it is intolerable in a civilized community.

120.    As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, plaintiff suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation, and violations of constitutional rights.

## COUNT X
### NEW JERSEY CIVIL RIGHTS ACT (N.J.S.A. § 10:6-1 & 2)

as to ALL DEFENDANTS

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

121.    Defendants, under color of law and statute, ordinance, reputation, custom and usage have deprived and caused plaintiff to be subjected to the

deprivations of rights, privileges and immunities secured by the New Jersey Constitution and law of the State of New Jersey, including his right to liberty, right to be secure as a person against the deployment of an unreasonable use of force permitting severe and permanent physical injury.

122.    Defendants acted knowing that they were violating plaintiff's legal and constitutional rights and have caused damages, including economic injury, humiliation, mental pain and suffering, and emotional distress.

123.    Defendants deprived plaintiff of civil rights, violating the New Jersey Constitution, and thus gives rise to claims for redress under N.J.S.A. § 10:6-1 & 2.

124.    Acting under color of law, defendants deprived and interfered with the exercise or enjoyment of rights guaranteed to by the New Jersey Constitution including, but not limited to:

    A.    the right to enjoy and defend life and liberty,

    B.    the right to pursue and obtain safety and happiness,

    C.    the right to due process of law,

    D.    the right to equal protection of the laws,

    E.    the right to any other natural and unalienable right retained by the people,

    F.    the right to privacy, and

    G.    the right to be free of cruel and unjust punishment.

125.  As a direct and proximate result of the negligent, willful, or reckless acts and omissions defendants committed, plaintiff suffered severe and permanent physical injury, mental anguish, loss of enjoyment of life, loss of income and the ability to earn income, expenses for past and future medical treatment and rehabilitation, and violations of constitutional rights.

## COUNT XI
### PUNITIVE DAMAGES

as to FORMER POLICE DIRECTOR SHEILAH COLEY, POLICE OFFICER RICHARD AGABITI, POLICE OFFICER MIGUEL ACOSTA, POLICE OFFICER JOHN DOE (1-10), DEPUTY U.S. MARSHAL JOHN DOE (1-10), and STATE TROOPER JOHN DOE (1-10)

Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth at length in this Count.

126.  The acts and omissions of defendants, as described herein, demonstrate a reckless and outrageous indifference to a highly unreasonable risk of harm, with deliberate indifference to, and conscious disregard for the safety of others, including plaintiff, thereby making an award of punitive-aggravating damages appropriate.

## PRAYER FOR RELIEF

Plaintiff demands judgment against each defendant, individually, jointly, and severally, for:

A.    general damages,

B.    compensatory damages,

C.    cost and interest,

D.    attorney's fees,

E.    punitive damages; and

F.    any other relief the Court deems just and equitable.

## TRIAL COUNSEL DESIGNATION

**PLEASE TAKE NOTICE,** that **TRACEY C. HINSON, ESQUIRE** and **ERIC D. DAKHARI, ESQUIRE,** are hereby designated as trial counsel in the above captioned litigation for the **HINSON SNIPES, LLP** law firm.

## JURY DEMAND

**PLEASE TAKE NOTICE,** plaintiff hereby demands a trial by jury as to all issues so triable.

## NOTICE OF INTENT TO USE OF TIME-UNIT BASIS
## PURSUANT TO RULE 1:7-1(b)

**PLEASE TAKE NOTICE,** plaintiff intends to utilize the time-unit basis for calculating unliquidated damages closing statement.

**HINSON SNIPES, LLP**

By:    *Eric Dakhari*

Eric D. Dakhari, Esquire

Dated: January 19, 2023